UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                              :
                                                    :         Chapter 7
       TOWN, LLC,                              :         Case no. 09-11827(SMB)
                                                    :
               Debtor.                         :
------------------------------------------------------X

## MEMORANDUM DECISION GRANTING
## TRUSTEE'S MOTION TO APPROVE SETTLEMENT

**A P P E A R A N C E S:**

SQUIRE, SANDERS & DEMPSEY LLP
Attorneys for Trustee, Robert L. Geltzer
1095 Avenue of the Americas, 31st Floor
New York, New York 10036

    Robert A. Wolf, Esq.
    Andrea K. Fisher, Esq.
        Of Counsel

RIVKIN RADLER LLP
Attorneys for Michael Callahan,
Robin Leigh & Huy Che Le
926 RXR Plaza
Uniondale, New York 11556

    Stuart I. Gordon, Esq.
    Matthew V. Spero, Esq.
        Of Counsel

SILVERMAN ACAMPORA LLP
Attorneys for BDC 56 LLC
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

    Adam L. Rosen, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

The Trustee seeks approval of a settlement (the "Settlement") between the estate and the debtor's landlord, BDC 56 LLC ("BDC"). Three of the debtor's former members, Michael Callahan, Robin Leigh and Huy Che Le (collectively, the "Objectants"), oppose the settlement. The Court conducted an evidentiary hearing, and approves the Settlement for the reasons set forth in this memorandum.

**BACKGROUND**

The debtor formerly operated a restaurant and bar at 13-15 West 56th Street in Manhattan (the "Premises") pursuant to a lease dated December 21, 1999 with the landlord, BDC (the "Lease"). The Premises were situated in a portion of the lobby and basement of the Chambers Hotel (the "Hotel") which was owned and operated by BDC or one of its affiliates. Among other things, the restaurant provided the Hotel with room service for its guests. The Lease terminates 15 years after the commencement date, sometime in 2015.

The rent was based on a percentage of gross sales, but could be no less than $17,500 per month. The Lease also obligated the debtor to pay its share of taxes and utilities as additional rent. The debtor was entitled to a credit for room service charges incurred by the Hotel's guests.

Two provisions contained in riders to the Lease bear directly on the dispute. Paragraph 67.1 (the "Termination Clause") allowed BDC to terminate the Lease in the event that it determined, in its sole discretion, that "the operation of the Restaurant is not satisfactory or that the operation of the Restaurant is adversely affecting the operation of the Hotel." The second provision was specifically aimed at retaining Geoffrey Zakarian,

2

the chef. Under ¶ 60.8, as modified (the "Management Clause" and collectively with the Termination Clause, the "Clauses"), an event of default occurred if Zakarian (or Zakarian Family Members) did not own at least 19% of the debtor, and Zakarian did not have the principal right to direct the management and decisions of the debtor.[1]

On April 7, 2009, three creditors filed an involuntary chapter 7 petition against the debtor. The debtor consented to the petition, and on April 10, 2009, the Court ordered relief. Robert Geltzer (the "Trustee") was appointed interim trustee, and succeeded to the position of permanent trustee by operation of law. See 11 U.S.C. § 702(d).

Following his appointment, the Trustee retained MYC & Associates ("MYC") to market the restaurant. MYC provides asset management, marketing, auction, appraisal, liquidation, real estate brokerage and property management services. Marc Yaverbaum, an MYC principal who assumed responsibility for the task, has experience appraising, marketing and brokering the sale of restaurant leases as well as restaurant inventory. Following MYC's retention, Yaverbaum inspected the Premises and reviewed the Lease. He estimated that the Lease could be sold for between $100,000 and $200,000.

Yaverbaum also inspected the inventory left at the premises. The hard inventory included approximately 40 restaurant tables and 96 chairs. Yaverbaum concluded that the hard inventory had little or no resale value in light of the current financial climate and surplus of used restaurant equipment available for sale. In addition, the costs of

---

[1]    Prior to this bankruptcy case, BDC claimed that Zakarian had violated ¶ 60.8, and served a notice of default. The debtor responded by filing a motion for a Yellowstone Injunction. The automatic stay mooted the Yellowstone suit.

3

auctioning the hard inventory, including advertising, storage and transportation, exceeded what little value it might have.  The debtor also left behind restaurant equipment, but Yaverbaum testified that the Trustee would have to hire licensed contractors to remove it, implying that the cost would exceed its value to the estate.

The liquid inventory consisted of 925 bottles of wine, and 30 unopened, sealed bottles of liquor.  Yaverbaum testified, without refutation, that the inventory consisted mostly of cheaper white wines, rose wines and some everyday drinking red wines.  He researched selling prices on the Internet for the same or similar wines, and concluded that the vast majority of the wines had little or no auction value.  Although the advertised market prices spoke for themselves, he attributed the low value to the fact that many of the white wines were four to five years old, and past their prime.  Furthermore, the costs associated with auctioning the wine, the same as the hard assets, wiped out whatever value they had to the estate.

Yaverbaum then proceeded to market the assets.  He posted their availability on MYC's website, placed an advertisement in the New York Times, and communicated with parties involved in restaurant management and ownership.  He ultimately showed the restaurant to five interested parties, but none made an offer due to the existence of the Clauses.  Although some parties indicated that they <u>might</u> make an offer if these provisions were not part of the assigned Lease, none committed to doing so and none quoted a price.  Yaverbaum also showed the wine inventory to one interested party, but received no offer.

4

Unable to find a buyer, the Trustee entered into the Settlement that he asks the Court to approve. It provides that BDC will pay the estate $175,000, and waive its claim for unpaid rent and additional rent. The unpaid base rent, exclusive of additional rent, totals at least $64,000 through the end of July.[2] In exchange, the Trustee will surrender possession of the premises and waive the estate's claim for room service charges which the Trustee's accountant valued at $65,000 based upon his review of the debtor's books and records. In addition, the trustee will surrender possession of the furniture, equipment, wine and liquor to BDC.

The Objectants opposed the Settlement. The main thrust of the objection concerned the Clauses. The Objectants argued that the Clauses were "de facto anti-assignment provisions" that are rendered unenforceable under 11 U.S.C. § 365(f)(1). If the Clauses are invalidated, the Lease will be substantially more valuable and marketable. The Objectants also offered $225,000 for the Lease in the event that the Court invalidates the Clauses.

The Court conducted an evidentiary hearing at which the Trustee, Yaverbaum and Callahan testified. The Trustee explained that he considered the possibility of trying to invalidate the Clauses, but ultimately rejected it. The litigation would be costly, and the estate would continue to accrue rent while it fought with BDC. Moreover, success was uncertain since it was unclear that the Termination Clause could be invalidated under Bankruptcy Code § 365(f). Unless the Trustee could invalidate both Clauses, the

---

[2] The order for relief was entered on April 10, 2009. Consequently, the April "stub" period was two-thirds of the month. The unpaid base rent for the April stub period, May, June and July equals $64,167.

5

litigation would not produce any benefit. If he decided to litigate, BDC might withdraw its offer. Even if he prevailed, the additional $50,000 offered by the Objectants would not make a material difference to the estate, particularly when weighed against the increased costs. In the end, he testified that a "bird in the hand is worth two in the bush" and he decided in the exercise of his business judgment to enter into the settlement.

## DISCUSSION

Bankruptcy Rule 9019 authorizes the court to approve compromises. The court's decision to approve a proposed settlement agreement lies within its discretion, and is warranted where the settlement is fair and equitable. Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) In reaching its determination, the court must make an "informed and independent judgment" of the risks and likely rewards of the litigation by appraising the probability of ultimate success if the claims are litigated, the expense, delay and expense of the litigation, the possible difficulties of collecting a judgment, and all other factors relevant to a full and fair assessment of the wisdom of the compromise. Id. at 424-25. Other relevant factors include the interest of the creditors including the degree to which they affirmatively support or do not object to the settlement, the competency and experience of counsel that support the settlement, and the extent to which the settlement is the product of arms length bargaining. Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007).

A court is not required to conduct a mini-trial of the issues, but rather, to canvass them. Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir.), cert. denied, 464 U.S. 822 (1983); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 499,

6

505 (Bankr. S.D.N.Y. 1991). Furthermore, the court may approve the compromise even if it believes that the debtor will prevail at trial. Anaconda-Ericsson, Inc. v. Hessen (In re Teletronics Servs., Inc.), 46 B.R. 426, 428 (E.D.N.Y. 1984), aff'd, 762 F.2d 185 (2d Cir. 1985); Drexel Burnham Lambert Group, Inc., 134 B.R. at 505. In the end, the court may approve the proposed settlement provided its independent review and judgment satisfy the court that the compromise does not "fall below the lowest point in the range of reasonableness." In re W.T. Grant Co., 699 F.2d at 608.

Initially, I conclude that the Trustee exercised appropriate business judgment in relying on the valuations provided by his retained professionals. Yaverbaum testified credibly from experience that the liquidation value of the inventory and equipment was essentially nil when the costs of liquidation were factored in. The Objectants implied at trial that Yaverbaum's conclusions were contradicted by other information, but none was offered into evidence. He also testified as to the value of the Lease, and the Objectants' own offer, discussed below, confirms his estimate. Finally, the Objectants hinted that the debtor's room service reimbursement claim exceeded the $65,000 calculated by the Trustee's accountants, but again, offered no credible evidence of a different amount.

The principal focus of the objection concerned the Clauses, and the value of the Lease if they were unenforceable under 11 U.S.C. § 365(f)(1). The latter states:

> Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

As it plainly states, § 365(f)(1) invalidates lease provisions that prohibit, restrict or condition the assignment of the lease. It is not necessary for the Court to resolve the

7

enforceability of the Clauses. The purpose of the Settlement, indeed any settlement, is to avoid litigating the question. Rather, the question is whether the Trustee exercised appropriate business judgment when he concluded that the benefits of the Settlement outweighed the risks and rewards of litigating that question.

Although the Objectants imply that the litigation is a "slam dunk," it is closer to a half court heave. The Objectants' contend that the Clauses are "de facto anti-assignability provisions" based on the Trustee's acknowledgement that their existence made it difficult to market the Lease. Leases often contain onerous provisions that make them difficult to market. For example, the rent may be too high. Obviously, the Court cannot rewrite every onerous clause under the guise of § 365(f), see Dewey Ranch Hockey, LLP, 406 B.R. 30, 37 (Bankr. D. Ariz. 2009)(geographic restriction on location of debtor's operations not unenforceable under § 365(f)(1)), and if a clause makes performance of a lease onerous or burdensome, the trustee can reject the lease.

It is not always easy, in this regard, to distinguish between an unenforceable anti-assignment provision and an onerous but enforceable term. The present lease provides a good example. Paragraph 11 of the Lease states that the tenant may not assign the Lease without BDC's consent. This is plainly the type of clause that interferes directly with the right to assign and is rendered unenforceable by § 365(f)(1). The Termination Clause, on the other hand, grants BDC the right to terminate the Lease in its sole discretion if the operation is unsatisfactory or adverse to the interests of the Hotel. BDC can terminate the Lease for numerous reasons unrelated to any assignment (which is covered by ¶ 11). The food or service may be unacceptable, the restaurant may be too noisy or attract an unsavory element, or the conditions may become unsanitary. In fact, BDC has the

8

present right to terminate, without regard to any proposed assignment. The restaurant is not operating, and, therefore, not operating satisfactorily. The Objectants have not identified a single case that invalidated a general termination provision such as the Termination Clause under § 365(f).

The Management Clause presents a closer question, but no clear answer. The Management Clause resembles a provision that makes a change of ownership a default. The Objectants correctly observe that courts have invalidated change of ownership clauses under § 365(f)(1). E.g., In re Crow Winthrop Operating P'ship, 241 F.3d 1121, 1123-24 (9th Cir. 2001). The objection, however, ignores the introductory language of § 365(f) which states that its application is limited by subsection (c).

Section 365(c)(1) prohibits the nonconsensual assignment of executory contracts when applicable non-bankruptcy law excuses the non-debtor party from accepting performance from or rendering performance to an entity other than the debtor. "A duty is not delegable if the obligee has relied on the obligor's "personality" (i.e., his honesty, skill, reputation, character, ability, wisdom or taste), the duty is based upon a close personal relationship or the obligor has promised to act in good faith or use his best efforts." In re Schick, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999). The Management Clause requires Geoffrey Zakarian (or Zakarian Family Members) to own at least 19% of the debtor, and also requires that Zakarian "have the principal right to direct the management and decisions of the Debtor." Zakarian is a respected chef, and the Management Clause implies that BDC specifically bargained for his personal services. If so, it cannot be compelled to accept performance from another.

9

In addition to the uncertainty of success, the Trustee concluded that a successful outcome would not add appreciably more to the estate. The Objectants offered only $225,000 or $50,000 more than BDC. They ran the restaurant for several years, and Callahan, an Objectant and a trial witness, was one of the managing members. The Objectants were in the best position to determine the value of the Lease, and apparently concluded that it was worth just $50,000 more without the two Clauses. The Objectants' offer lends support to Yaverbaum's estimate that the Lease was worth between $100,000 and $200,000 "as is," and the conclusion that BDC's offer, which comes in at the high end of Yaverbaum's estimate, is beneficial to the estate.

The additional $50,000 would cover two or three months of rent, depending on the tax and utility charges. The uncertainty surrounding the unenforceability of the Clauses, coupled with the cost of litigation and the continuing accrual of rent during the litigation, supports the Trustee's business judgment in entering into the Settlement.[3]

Finally, the Trustee's surrender of the inventory and equipment and his waiver of the room service charges in exchange for the BDC's release of liability for rent and additional rent is beneficial to the estate. The four months of unpaid base rent totals roughly $64,000, exclusive of additional rent. These post-petition charges are administrative claims. See 11 U.S.C. § 365(d)(3). The room service charges equal approximately $65,000, and the other property is worthless. Thus, the estate is receiving dollar-for-dollar value for the assets it is giving up.

---

[3] At trial, the Objectants' counsel orally stated that the Objectants would fund the rent during the period of the challenge as well as the litigation expenses. Assuming the spur of the moment offer was real, it still made no difference. Litigation and delay costs were factors, but not the only factors. The Trustee testified that he preferred the certainty of BDC's $175,000 offer to the Objectants' contingent $225,000 offer.

10

In addition, other factors weigh in favor of approving the settlement. The Trustee is an experienced trustee, both sides were represented by competent counsel, and the Settlement represents the product of an arms-length negotiation. No one else has objected to the Settlement. Furthermore, it appears that neither the Settlement amount nor the additional $50,000 offered by the Objectants will affect the distribution to unsecured creditors. The Trustee testified that he does not expect to recover any other significant amounts. The Internal Revenue Service and New York State have asserted tax claims in the approximate aggregate amount of $200,000. Thus, there will probably not be a distribution to unsecured creditors in this case. In fact, the Objectants' opposition does not appear to be based on their status as creditors, if they are creditors. At trial, their lawyer explained that they are personally liable for the taxes, and want to operate the restaurant to work off their personal debt.

Having independently reviewed the Settlement, I conclude that it does not "fall below the lowest point in the range of reasonableness." In re W.T. Grant Co., 699 F.2d at 608. Accordingly, the Settlement is approved, and the Trustee is directed to submit a proposed order. The foregoing constitutes the Court's findings of fact and conclusions of law.

Dated: New York, New York
       July 27, 2009

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge